**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHNISHA PROVOST, Individually, Natural Guardian, and Next Friend of M.R.H, a minor, and LAKESHA MACKLIN, Individually and Next Friend of R.J.M., a minor, and K.D.H., a minor, as wrongful death beneficiaries of RODNEY HESS (deceased),** | ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **No.: 1:17-cv-01060-STA-egb** |
| **CROCKETT COUNTY, TENNESSEE, CAPTAIN JORDAN SPRAGGINS, and SHERIFF TROY KLYCE,** | ) ) ) ) ) | |
| **Defendants.** | ) ) | |

---

## ORDER PARTIALLY GRANTING AND PARTIALLY DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Plaintiffs Johnisha Provost, individually and as next friend and natural guardian of M.R.H., a minor, and Lakesha Macklin, individually and as mother and next friend of R.J.M. and K.D.H., minors, the heirs at law and wrongful death beneficiaries of Rodney Hess, deceased, filed this action pursuant to 42 § U.S.C. § 1983 and the Tennessee Governmental Tort Liability Act ("TGTLA"), Tenn. Code Ann. § 29-20-101, *et seq.*, for the alleged violation of Hess' constitutional and civil rights resulting in his death. Plaintiffs initially filed suit against Crockett County, Tennessee, and Crockett County Sheriff's Department Captain Jordan Spraggins. On August 8, 2017, by agreement of the parties, Crockett County Sheriff Troy Klyce was added as a defendant. (ECF No. 31.)

Subsequently, the parties submitted an agreed order as to Defendant Crockett County's motion for partial dismissal. Pursuant to that order, Plaintiffs' claims arising under the TGTLA (cause of action one through four) brought against Crockett County, Plaintiffs' common law claims brought against Crockett County (cause of action seven), and Plaintiffs' request for punitive damages against Crockett County were dismissed. (ECF No. 29.)

After Defendants filed the present motion for summary judgment (ECF No. 43), Plaintiffs filed a motion in limine to exclude the opinion of Defendants' expert, John J. Ryan (ECF No. 52), a response to Defendants' motion (ECF No. 56), and an objection and motion to exclude/strike portions of Defendants' evidence. (ECF No. 56-2.) Defendants have filed a reply to Plaintiffs' response to their motion for summary judgment (ECF No. 57) and a response to Plaintiffs' objection and motion to exclude/strike. (ECF No. 58.)

The motion in limine was referred to the Magistrate Judge for determination, and, on July 23, 2018, the Magistrate Judge entered an order partially granting and partially denying Plaintiffs' motion. (ECF No. 65.) Neither party appealed that ruling. Therefore, in making its decision on the present motion, in accordance with the Magistrate Judge's decision, the Court will not consider Ryan's testimony "as to legal conclusions on matters of law or legal standards, including 'legal mandates' and whether something is 'objectively reasonable' under the Constitution or case law since whether Defendants' actions were reasonable under the 4th Amendment is the ultimate issue." (*Id.* at p. 6.)

> However, Ryan can testify as to his specific knowledge of certain actions and whether those actions violated police procedures or policy. Ryan … has specific knowledge of law enforcement standards and can testify as to those standards and the specific facts concerning this case. If Ryan intends to testify as to what legal mandates officers are trained on, as Defendants state, then Ryan may opine on what police training consists of, but may not opine on what is mandated by the law.

(*Id.*)

To the extent that Plaintiffs have filed a "motion" to exclude/strike portions of Defendants' evidence, the Court **DENIES** the motion for failure to comport with the Local Rules of this Court which require that a certificate of consultation and proposed order be filed with a non-dispositive motion. *See* Local Rule 7.2. However, the Court will consider Plaintiffs' objections to Defendants' statement of undisputed facts as discussed below.

For the reasons set forth below, Defendants' motion for summary judgment is **PARTIALLY GRANTED** and **PARTIALLY DENIED**.

<u>Standard of Review</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, the Court must review all the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in favor of the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court "may not make credibility determinations or weigh the evidence." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 360 (6th Cir. 2014). These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court

should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## Statement of Material Undisputed Facts

Pursuant to the Local Rules of this Court, Defendants have prepared a statement of material undisputed facts (ECF No. 43-2) "to assist the Court in ascertaining whether there are any material facts in dispute." Local Rule 56.1(a). Plaintiffs have responded to Defendants' statement and have attached their own statement of facts. (ECF No. 56-3.) Defendants have also responded to Plaintiffs' statement of facts. (ECF No. 57.)

A fact is material if it "might affect the outcome of the lawsuit under the governing substantive law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994), and *Anderson*, 477 U.S. at 247–48). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. For purposes of summary judgment, a party asserting that a material fact is not genuinely in dispute must cite to particular parts of the materials in the record and show that the materials fail to establish a genuine dispute or that the adverse party has failed to produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1). Here, as the nonmoving party, Plaintiffs must respond to Defendants' statement of fact "by either (1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed." Local Rule 56.1(b). Additionally, Plaintiffs may "object that the material cited to

support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

When Plaintiffs assert that a genuine dispute of material fact exists, they must support their contention with a "specific citation to the record." Local Rule 56.1(b). If Plaintiffs fail to demonstrate that a fact is disputed or fail to address Defendants' statement of facts properly, the Court will "consider the fact undisputed for purposes" of ruling on the motion. Fed. R. Civ. P. 56(e)(2); *see also* Local Rule 56.1(d) ("Failure to respond to a moving party's statement of material facts, or a non-moving party's statement of additional facts, within the time periods provided by these rules shall indicate that the asserted facts are not disputed for purposes of summary judgment."). Under Rule 56 of the Federal Rules of Civil Procedure, the Court "need consider only the cited materials" but has discretion to "consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

In the present case, Plaintiffs have made various objections regarding Defendants' statement of facts that purport to show the subjective state of mind of the parties at various times during the relevant events, and they object to any "fact" that is actually a legal conclusion or is an attempt to invade the province of the jury. The Magistrate Judge's ruling on Plaintiffs' motion in limine has already eliminated from the report of Defendants' expert legal conclusions or attempts to invade the province of the jury. As for statements concerning the subjective state of mind of Defendant Officer Spraggins, the Court will allow Defendants to present the statements of Spraggins describing his state of mind and then will decide whether, as a matter of law, his state of mind was objectively reasonable or whether this is an issue for the jury to

decide.[1]  *See Kingsley v. Hendrickson,* 135 S. Ct. 2466, 2470 (2015) ("The question before us is whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officers' use of that force was *objectively unreasonable*. We conclude that the latter standard is the correct one.")

The Court finds that there is no genuine dispute as to the following material facts, unless otherwise noted.[2]

On March 16, 2017, Ashley Parker, a resident of Crockett County, Tennessee, called 911 and reported "that there was a guy [later determined to be Rodney Hess] that's, like, all over the road, parking, stopped, blocking the road."  She further reported that she "didn't know really what he was doing, but cars couldn't get by, and [she] was scared he was going to get hit or cause a wreck."  (Pls' Resp. to Defs' SOMUF ¶ 1, ECF No. 56-3.)

Upon hearing the initial radio broadcast concerning the 911 call, Jordan Spraggins, a Captain with the Crockett County Sheriff's Department ("CCSD"), traveled to the reported location of Hess.  When Spraggins arrived on the scene, he saw a white Chevrolet Tahoe parked on the shoulder of the road.  Spraggins stopped and monitored the vehicle.  (*Id.* at ¶¶ 2 – 4.)

Shortly thereafter, Hess began to drive away from Spraggins.  Hess then made an abrupt U-turn and stared at Spraggins as their vehicles passed driver's side to driver's side. Hess pulled in behind Spraggins, perpendicular to the roadway.  Spraggins turned his vehicle around so that he was several yards from Hess with the front of his truck facing the driver's

---

[1]  In deciding this motion, the Court will look only at the state of mind statements made by Spaggins and not the statements of the other officers present at the scene since the issue is whether Spraggins made an objectively reasonable decision to shoot Hess based on the facts known to him.

[2]  The facts are stated for the purpose of deciding this motion only.

side of Hess' vehicle.[3]   Spraggins initiated his vehicle's blue lights and requested backup because he was fearful of Hess.  (*Id.* at ¶¶ 5 – 10.)

Spraggins's action of calling for backup was consistent with generally accepted policy, practice, and training for application in field operations when officers are dealing with someone who is in crisis or impaired.[4]

A few minutes later CCSD Lieutenant Jimmy Irvin arrived on the scene.  Maury City Police Officer Neal Towater also arrived on the scene.  The three officers (Spraggins, Irvin, and Towater) exited their vehicles, and Spraggins explained what was transpiring.  (*Id.* at ¶¶ 12 – 14.)  Spraggins' action of coordinating with other officers is consistent with generally accepted policy, practice, and training for application in field operations when officers are dealing with someone who is in crisis or impaired.[5]

Irvin then walked to Hess's vehicle and attempted to communicate with Hess.  (*Id.* at ¶¶ 16 - 17.)  Spraggins' action of having other officers attempt to communicate with Hess is consistent with generally accepted policy, practice, for application in field operations when officers are dealing with someone who is in crisis or impaired.[6]

---

[3]  Defendants contend that Spraggins was twenty-five feet away from Hess' vehicle, while Plaintiffs contend that he was twelve yards away.  (*Id.* at ¶ 8.)

[4]  Defendants have submitted as their statement of fact ¶ 11, "Spraggins' action of calling for backup was consistent with generally accepted policy, practice, training, and legal mandates trained to officers for application in field operations when dealing with someone who is in crisis or impaired," as opined by their expert John J. Ryan.  The Magistrate Judge's order on Plaintiff's motion in limine prohibits reference to "legal mandates" but allows reference to "generally accepted policy, practice, and training."  Therefore, the Court will allow statements made by Defendants' expert concerning generally accepted policy, practice, and training for application in field operations with no mention of "legal mandates."

[5]  *See id.* regarding Defendants' statement of fact ¶ 15.

[6]  *See id.* regarding Defendants' statement of fact ¶ 19.

Irvin attempted to communicate with Hess. (*Id.* at ¶ 17.) Hess did not comply with Irvin's order to lower his window.[7] Irvin unsuccessfully attempted to open Hess' vehicle's door. (*Id.* at ¶ 20.)

As Irvin attempted to interact with Hess, Spraggins thought that Hess appeared to be "real agitated-looking," and Spraggins became concerned.[8]

Alamo Police Department Chief of Police Jim Knox subsequently arrived on the scene. Knox parked his vehicle on the passenger side of Hess' vehicle in front of the civilian traffic, i.e., the opposite side of Hess from Spraggins, and started approaching Hess' vehicle. (*Id.* at ¶¶ 23 - 25.)

When Sheriff Klyce arrived on the scene, he pulled his vehicle in front of Hess' vehicle. The driver's side window of Klyce's vehicle was down. Klyce commanded the officers to block in Hess' vehicle with their vehicles. (*Id.* at ¶¶ 26 - 29.)

CCSD Lieutenant Roy Mosier arrived immediately thereafter and positioned his vehicle on the passenger side of Hess' vehicle. CCSD Chief Deputy Eric Uselton also arrived and positioned his vehicle on the passenger side of Hess' vehicle. (*Id.* at ¶¶ 30 - 31.)

Spraggins thought that Hess' vehicle made a "real quick jerk" backwards which "sent a lot of fear through" him because Irvin was standing beside the vehicle and other units were

---

[7] Plaintiffs dispute any characterization of Hess' actions as being "uncooperative" and note that officers on the scene heard Hess speaking. (*Id.* at ¶ 18.) However, they do not dispute that Hess did not lower his window when speaking to Irvin.

[8] Regarding Defendants' statement of fact ¶¶ 20 and 21, as noted above, the Court will consider statements made by Spraggins as to his state of mind during the relevant events. However, this does not equate to a finding that his state of mind was objectively reasonable.

arriving on the scene.[9]  Spraggins ran back to his vehicle and moved it in an attempt to "start box[ing] Hess in" to "keep [Hess] from…running over [him] or Towater or the sheriff."[10]

The action of setting up containment of Hess' vehicle is consistent with generally accepted policy, practice, and training for application in field operations when officers are dealing with someone who is in crisis or impaired.[11]

Spraggins exited his vehicle while maintaining a visual on Hess' vehicle and Irvin. Spraggins began walking to Irvin's vehicle in an attempt to move it behind Hess in order to "isolate[] the incident."  (*Id.* at ¶¶ 37 - 38.)

Before Spraggins could reach Irvin's vehicle, he thought he heard Hess' vehicle's engine rev up and Hess' vehicle's tires squeal. He thought that Hess' vehicle appeared to "shift weight…like it was going on two wheels very fast."  It appeared to Spraggins that Hess' vehicle had "reversed suddenly."[12]

At a certain point, Hess' vehicle moved, and Irvin jumped out of the way.  He was not struck by the vehicle nor injured by it in any way.  No other officer was struck by the vehicle or injured by it in any way.  (*Id.* at ¶¶ 44, 51.)

Spraggins testified that he thought Irvin had been hit by Hess' vehicle and perhaps "sucked under the vehicle."[13]

---

[9]  *See id.* regarding Defendants' statement of facts ¶¶ 32 – 34.

[10]  *See id.* regarding Defendants' statement of fact ¶ 35.

[11]  *See supra* note 4 regarding Defendants' statement of fact ¶ 36.

[12]  *See supra* note 8 regarding Defendants' statement of fact ¶¶ 39 – 42.

[13]  *See id.* regarding Defendants' statement of fact ¶¶ 47, 48.

Spraggins then perceived Hess' vehicle as moving in his direction. (*Id.* at ¶ 50.) Spraggins fired his gun three times at Hess' vehicle. (*Id.* at ¶ 52.) As Hess' vehicle went by Spraggins, Spraggins fired another shot at the vehicle. (*Id.* at ¶ 56.)

Spraggins never heard Irvin scream and never heard anyone else scream that Irvin was under Hess' truck. (Defs' Resp. to Pls' SOMUF ¶ 100, ECF No. 57.)

At the same time that Spraggins fired shots into Hess' vehicle, Mosier had his weapon drawn. Mosier was "looking for a shot" but "didn't have one." Also at the same time that Spraggins fired shots into Hess' vehicle, Knox "had [his] hand on [his] weapon…fixing to draw it."[14] (Pls' Resp. to Defs' SOMUF ¶¶ 57 - 59, ECF No. 56-3.)

All law enforcement officers are aware of the threat posed by a vehicle striking an officer even at slow speed. Law enforcement training throughout the United States recognizes and trains personnel that, when an officer has probable cause to believe that a subject has committed a violent felony involving the threatened infliction of serious bodily harm or death, the officer may use deadly force to prevent escape.[15]

Sheriff Klyce heard the gunshots. Klyce "was so focused" on Hess' vehicle's movement that he did not actually view Spraggins' firing. (*Id.* at ¶¶ 67 - 68.)

---

[14] Plaintiffs object to these facts as being irrelevant to the issues presented in this case. They do not dispute that Defendants' proffered statements are factual.

[15] This is stated as a general principle regarding practices and procedures and not necessarily as applied to the facts of this case. *See supra* note 4 regarding Defendants' statement of fact ¶¶ 61, 66.

It is recognized in law enforcement that the use of deadly force cannot rise and fall on the order of an incident commander who may not be in a position to perceive the same threats that another officer sees.[16]

After Spraggins fired his gun, Hess drove his vehicle away from the scene and came to rest in an adjoining field. Klyce followed Hess, and, when Hess' vehicle stopped, Klyce opened Hess' door to "check on him." When he exited his vehicle to check on Hess, it was the first time that Klyce had exited his vehicle while on the scene. (*Id.* at ¶¶ 77 - 79.)

Knox and another EMT quickly arrived at Hess' vehicle and began rendering aid. Knox summoned a medevac helicopter, and Hess was transferred into an ambulance. (*Id.* at ¶¶ 80 - 81.)

Irvin testified that he has not "shot at" individuals "driving off in vehicles at traffic stops," explaining that in such situations, he was "trying to get out of the flying rocks and debris when they take off." (Defs' Resp. to Pls' SOMUF ¶ 101, ECF No. 57.)

Irvin heard Hess "holler" in the truck after he heard the gunfire. Hess was moaning and moving his arms when Chief Jim Knox went to render aid to him. Knox has been trained as an EMT. (*Id.* at ¶ 99.)

CCSD's Deadly Force Policy was in full effect at the time of the events giving rise to this lawsuit. This policy provides, "The use of deadly force by a member of the Crockett County Sheriff Department shall be in compliance with Tennessee Code Annotated, 40-7-108." The policy permits its officers to use deadly force if "[t]he officer has probable cause to believe that the individual to be arrested poses a threat of serious bodily injury, either to the officer or to

---

[16] This is stated as a general principle regarding practices and procedures and not necessarily as applied to the facts of this case. *See supra* note 4 regarding Defendants' statement of fact ¶ 71.

others unless immediately apprehended." (Pls' Resp. to Defs' SOMUF ¶¶ 82 - 84, ECF No. 56-3.)

There is no evidence showing any deficiency in the policies, practices, customs, training, supervision, or disciplinary actions of the CCSD. (*Id.* at ¶ 85.)

Spraggins graduated from the police academy. He underwent training on and obtained his yearly qualification to use his department-issued firearm. Spraggins and all other officers employed by the CCSD at the time of the relevant events were POST certified. Spraggins and all other officers employed by the CCSD had passed all the courses required by the State of Tennessee. (*Id.* at ¶¶ 86 - 89.) At all times relevant, Crockett County provided its officers, including Spraggins, with forty hours of in-service training each year. The annual forty hours of in-service training encompassed various topics including, but not limited to, EVOC, firearms, active shooters, traffic stops, and the appropriate use of force – including deadly force - and mental health, which incorporates training on de-escalation. (*Id.* at ¶¶ 91 - 92.) Spraggins obtained training through criminal investigation school and active shooter instructor school. Spraggins is qualified to instruct a program called ALERRT, whereby he trains other officers and teaches how to respond to an active shooter threat. CCSD trained Spraggins and other officers on when it is appropriate to use deadly force. (*Id.* at ¶¶ 93 - 95.)

There was an internal investigation into the shooting which determined that Spraggins acted appropriately. (*Id.* at ¶ 97.)[17]

---

[17] Plaintiffs dispute that the result of the investigation was proper but do not dispute that the investigation was conducted and that the result showed that Spraggins acted appropriately. (*Id.*) Furthermore, they have not alleged any facts showing that the investigation was inadequate. Instead, in their response to Defendants' statement of fact ¶ 97, they merely reference the video of the event as shown by the body camera of Officer Irvin. (*Id.*)

Troy Klyce was the final law enforcement policymaker for Crockett County, Tennessee, at the time of the relevant events. (Defs' Resp. to Pls' SOMUF ¶ 104, ECF No. 57.)

Spraggins shot and killed Rodney Hess on March 16, 2017. (*Id.* at ¶ 105.)

<u>Analysis</u>

Plaintiffs concede that Defendant Klyce is entitled to summary judgment in his individual capacity. (ECF No. 56-1, p. 2 n. 2.) Additionally, Plaintiffs have acknowledged that "[t]here is no evidence that would show any deficiency in the policies, practices, customs, training, supervision or discipline of the CCSD." (ECF No. 56-3 ¶ 85). Furthermore, Plaintiffs have not responded to the portion of Defendants' motion that argues that the claims against Spraggins and Klyce in their official capacities should be dismissed because official capacity claims are redundant when the municipality is also named in the lawsuit, as in the present case. Because this is a correct statement of law, *see Shamaeizadeh v. Cunigan*, 338 F.3d 535, 556 (6th Cir. 2003) (noting that a § 1983 action against a municipal official in his official capacity is treated as an action against the municipality itself), and because "a plaintiff is deemed to have abandoned a claim when [he or she] fails to address it in response to a motion for summary judgment," *King v. Autozoners*, LLC, 2016 WL 4572239 at *8 (W.D. Tenn. Aug. 31, 2016), *aff'd*, 695 F. App'x 944 (6th Cir. 2017) (citation omitted), the Court grants summary judgment to Defendants on all of these claims. The excessive force claim against Defendant Officer Spraggins in his individual capacity and the municipal liability ratification claim against Crockett County will be decided on the merits as discussed below.

<u>Claim Against Officer Spraggins</u>

Defendants contend that summary judgment should be granted to Officer Spraggins on the excessive force claim brought against him because he is entitled to qualified immunity.

According to Defendants, the actions of Spraggins were objectively reasonable and, thus, did not violate the Fourth Amendment. They specifically argue that Spraggins reasonably used deadly force in response to the threat of deadly force by Hess.

Section 1983 imposes liability on any "person who, under color of any statute, ordinance, regulation, custom or usage, of any State" subjects another to "the deprivation of any rights, privileges, or immunities secured by the Constitution or laws." 42 U.S.C. § 1983. In order to prevail on such a claim, a § 1983 plaintiff must establish "(1) that there was the deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law." *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003). "Section 1983 is not the source of any substantive right, but merely provides a method for vindicating federal rights elsewhere conferred." *Humes v. Gilless*, 154 F. Supp. 2d 1353, 1357 (W.D. Tenn. 2001) (citing *Graham v. Connor*, 490 U.S. 386, 393-94 (1989)).

It is well-settled that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When confronting a claim of qualified immunity, a Court is faced with two general questions. First, viewing the facts in the light most favorable to the plaintiff, the Court considers whether the officer violated a constitutional right. Second, the Court asks whether the contours of the right were sufficiently clear that a reasonable official would have understood that what he was doing violated that right. *Pearson vs. Callahan*, 555 U.S. 223 (2009).[18]

---

[18] In *Saucier v. Katz*, 533 U.S. 194 (2001), the Court mandated this two-step sequence for resolving qualified immunity claims. *Pearson* determined that, while the sequence set forth in *Saucier* is often appropriate, it should not be regarded as mandatory. 555 U.S. at 236. The

The essence of the qualified immunity test is whether the officers had "fair notice" that they were acting unconstitutionally. *Hope vs. Pelzer*, 536 U.S. 730, 739 (2002). The qualified immunity doctrine "seeks to balance two important interests: the need to hold public officials accountable when they exercise power irresponsibly and the need to shield the officials from harassment, distraction and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Accordingly, when a Court is faced with a motion for summary judgment alleging qualified immunity, the motion should only be granted if a reasonable juror could find that the evidence "viewed in the light most favorable to plaintiff" shows that the defendant did not violate a constitutional right that was clearly established. *Cole v. City of Dearborn*, 448 F. App'x 571, 574 (6th Cir. 2011). If the record could support a jury's finding that the defendant violated a clearly established right, the Court must deny summary judgment. *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015).

Defendants first contend that Spraggins did not violate Hess' rights under the Fourth Amendment right. If no genuine dispute of material facts exists as to whether Spraggins violated Hess' constitutional rights, then all other issues in this case become moot. *See Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008) ("The first step must be viewed as the threshold inquiry: 'Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?'" (quoting *Scott v. Harris*, 550 U.S. 372 (2007))).

Plaintiffs claim that Defendants violated Hess' Fourth Amendment right to be free from an unreasonable seizure by using deadly force. The Fourth Amendment guarantees that

<hr>

*Pearson* Court did not change the substance of the two *Saucier* prongs; instead, it merely recognized that lower courts should have the discretion to decide whether following the two prongs as originally set forth by *Saucier* is worthwhile in particular cases. *Id.* at 242

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Fourth Amendment is violated unless the "governmental interests" in effectuating a particular kind of seizure outweigh the "nature and quality of the intrusion on the individual's Fourth Amendment interests." *Scott*, 550 U.S. at 383; *United States v. Place*, 462 U.S. 696, 703 (1983). Furthermore, there must be a "governmental interest" not only in effectuating the seizure but also in "how the [seizure] is carried out." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985). "Given the extreme intrusion caused by use of deadly force, the countervailing governmental interest must be weighty indeed; only in rare instances may an officer seize a suspect by use of deadly force." *Davenport v. Causey*, 521 F.3d 544, 551 (6th Cir. 2008) (citation omitted).

Balancing a particular governmental interest in the use of deadly force against the intrusion occasioned by the use of that force is inherently a fact specific inquiry. *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015). There are certain facts and circumstances which are important when evaluating whether an officer has probable cause to believe that deadly force is necessary, and a claim under the Fourth Amendment requires an objective standard of reasonableness with respect to the facts and circumstances as encountered by the officer at the time of the incident. *Graham*, 490 U.S. at 395-96; *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007) (citing *Graham*).

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. This calculus includes consideration of such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or

others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (citing *Tennessee v. Garner*). "These factors are not an exhaustive list, as the ultimate inquiry is 'whether the totality of the circumstances justifies a particular sort of seizure.'" *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007) (quoting *St. John v. Hickey,* 411 F.3d 762, 771 (6th Cir. 2005)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)).

When "the officer defendant is the only witness left alive to testify, the award of summary judgment to the defense in a deadly force case must be decided with particular care." *Burnett v. Gee*, 137 F. App'x 806, 809 (6th Cir. 2005) (citation omitted); *accord Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994) (holding that the "defendant knows that the only person likely to contradict him or her is beyond reach . . . [s]o a court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements, and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at a trial")); *Scott v. Henrich*, 39 F.3d 912, 914-915 (9th Cir. 1994) (pointing out that the Court may not simply accept what may be a self-serving account by the police officer; instead, it must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence would convince a rational fact finder that the officer acted unreasonably).

In deadly force cases, the Sixth Circuit generally applies a "temporally segmented analysis to the possible erroneous actions taken by police officers." *Chappell v. City of Cleveland*, 585 F.3d 901, 914 (6th Cir. 2009). Referred to as the "segmenting rule" or

"segmenting approach," the Sixth Circuit "embrace[s] a somewhat narrow interpretation of the Supreme Court's mandate that courts look to the totality of the circumstances in determining if excessive force is used." *Claybrook v. Birchwell*, 274 F.3d 1098, 1103 (6th Cir. 2001). Thus, under the segmenting rule, a court must "'carve up' the events surrounding the challenged police action and evaluate the reasonableness of the force by looking only at the moments immediately preceding the officer's use of force," an approach that "applies even to encounters lasting very short periods of time." *Greathouse v. Couch*, 433 F. App'x 370, 372 (6th Cir. 2011) (citation omitted): s*ee also Dickerson v. McClellan*, 101 F.3d 1151 (6th Cir. 1996) (analyzing the claim by "carv[ing] up the incident into segments and judg[ing] each on its own terms to see if the officer was reasonable at each stage").

In the present case, the Court will look only at the reasonableness of Defendant Officer Spraggins' decision to shoot Hess because a segmented analysis renders the reasonableness of other actions, such as the decision to "box in" Hess, immaterial at this juncture. However, the Court notes that the unrefuted testimony of Defendants' expert shows, as a matter of law, that Defendants' use of the box in approach was reasonable in these particular circumstances. Furthermore, Plaintiffs have not argued that the box in approach was not objectively reasonable.

Defendants contend that Spraggins' decision to shoot Hess was reasonable because Hess started revving his engine and moving his vehicle such that Spraggins thought that Officer Irvin had been struck by the vehicle and thought that he and the other officers on the scene were in danger of being run over. Defendants argue that Spraggins was merely defending himself, the other officers, and the public, and, thus, the shooting of Hess was reasonable under the circumstances. As noted by Defendants, there is no Fourth Amendment violation when an officer shoots at a driver who poses an immediate threat to the officer's safety or the safety of

others — for example, a driver who objectively appears ready to drive into an officer or bystander with his car. *See Brosseau v. Haugen*, 543 U.S. 194, 197–200 (2004) (citations omitted). According to Defendants, the testimony of Spraggins and the other officers support their account of the shooting.

In response, Plaintiffs have submitted the dash camera videos of Officers Towater and Irvin, the body camera video of Irvin, and the cell phone video made by Hess. (ECF Nos. 50, 51.) Viewing these videos and other evidence in the record in the light most favorable to Plaintiffs, the Court finds that there are disputed issues of material fact from which a jury could find that Spraggins' action in shooting and killing Hess was not objectively reasonable.

The record shows that Irvin was 6'4" and could see over the top of Hess' vehicle. (Irvin Dep. p. 9, ECF No. 47-8.) Irvin was at the driver's side of the vehicle, rather than being in front of it or behind it. (Screenshot p. 27, ECF No. 43-11.) When the vehicle started moving, Irvin was able to move out of the way to avoid injury.[19] Defendants' expert even states in his report that "it is clear from the video from Irvin's MVR [mobile video recording] that, once the vehicle moves in Irvin's direction, Irvin retreats backwards to avoid being struck." (ECF No 43-11, p. 28.)

Neither Irvin nor any other officer screamed or called out that Irvin had been hit as the vehicle began to move. A jury could find, after viewing the videos, that Spraggins should have been able to see Irvin or should have delayed shooting in order to get a visual on Irvin and that

---

[19] Defendants argue that Irvin's testimony that he thought he was going to be hit by Hess' vehicle is evidence that it was reasonable for Spraggins to think he had, in fact, been hit. However, the jury could find that Irvin's testimony merely shows the reason that he moved out of the way.

his action in shooting when he thought he heard Hess revving the vehicle's engine not only put Hess in danger but also put Irvin in danger of being shot by Spraggins.

Defendants point out that Hess "sped away" after being shot as evidence that Hess was attempting to flee. However, the jury could find that, at that point, Hess had been hit by shots from Spraggins' AR-15 and was presumably mortally wounded. His action in driving away may have been either reflexive or an attempt to get away from the shooting, rather than an attempt to escape capture. This is a question for the jury to decide.

The jury could also find from viewing the videos that, even though civilian vehicles were in somewhat close proximity to Hess' vehicle, they were not positioned so as to be in any danger from Hess. (Screenshot p. 38, ECF No. 43-11.)[20]

Based on this evidence, the Court finds that there are disputed issues of fact as to whether Defendant Officer Spraggins violated Hess' Fourth Amendment right to be free of excessive force and that a jury could find that the death of Hess resulted from an unreasonable seizure, i.e., excessive force, in violation of Hess' Fourth Amendments rights. *See*, *e.g.*, *Lewis v. Charter Twp. of Flint,* 660 F. App'x 339, 344 (6th Cir. 2016) (affirming the denial of summary judgment because the record presented "a scenario" wherein "it would be possible for a jury to conclude that the officer shot at the decedent in self-defense, but a reasonable jury could also conclude that the decedent 'was merely trying to flee ... and [the officer] purposefully shot [him] under circumstances of no threat to [the officer] or others'" (citation omitted)); *Hermiz v. City of Southfield*, 484 F. App'x 13, 16 (6th Cir. 2012) (stating that "[a] reasonable jury drawing inferences in the estate's favor could determine that an officer that aimed and fired shots while to

---

[20] Defendants acknowledge that, under *Tennessee v. Garner*, it would be unconstitutional to use deadly force to prevent the escape of a suspect who posed no harm to the officer and no threat to others.

the side of the vehicle," after "the hood of [the suspect's] car already passed the point where it could harm [the officer]," "would have had time to realize that he was no longer in the path of the car and no longer in immediate danger"); *Smith v. Cupp*, 430 F.3d 766, 774 (6th Cir. 2005) (holding that disputed issues of fact precluded summary judgment because "a jury could conclude that [the officer] did not fire as the vehicle was bearing down on him in fear of his life," but rather that he "fired as he ran toward the driver side of the car after the car passed him").

As to the second prong of the qualified immunity test, the Court finds that the right to be free from excessive force has long been "clearly established."

> When making a qualified immunity analysis, it is important to remember that the defendant is, in essence, saying: 'If the plaintiff's version is credited, what I did, judged today, arguendo would be wrongful, but at the time I acted, no reasonable officer would have known he was acting wrongfully' (citation omitted). As this circuit has analyzed the qualified immunity issue in excessive force cases, the question of whether the reasonable officer would have known his conduct violated clearly established constitutional rights can be answered by the initial inquiry of whether the officer's use of force was objectively reasonable (citations omitted). It is clear from this circuit's analyses in various excessive force decisions that, having concluded that the right to be free from excessive force is clearly established, whether we grant qualified immunity in a particular case depends upon whether the officer did, in fact, use excessive force (i.e., force that was not objectively reasonable) (citations omitted). To put it another way, if there is a genuine issue of fact as to whether an officer's use of force was objectively reasonable, then there naturally is a genuine issue of fact with respect to whether a reasonable officer would have known such conduct was wrongful.

*Kostrzewa vs. City of Troy*, 247 F.3d 633, 641-642 (6th Cir. 2001) (citations and internal quotation marks omitted).

In *King vs. Taylor*, 694 F.3d 650 (6th Cir. 2013), an arrestee was shot and killed by a state police trooper. The trooper claimed qualified immunity which was denied by the Sixth Circuit Court of Appeals. *Id.* at 665. The Sixth Circuit held as follows:

> Viewing the record in the light most favorable to plaintiffs, we conclude that a factual dispute exists whether Taylor reasonably believed that King posed a threat of serious physical harm to Taylor or the other officers. In our view, a jury could

> find, based on the forensic evidence, expert testimony, and common sense, that King did not threaten the officers by pointing a gun at them just before he was shot.

*Id.* at 662 – 63; *see also Brandenburg vs. Cureton*, 882 F.2d 211, 215 (6th Cir. 1989) (finding that, although a detective claimed that the decedent pointed his weapon "directly" at him and the other officers, "presumably proving that he or any officer would have a subjective belief in a threat of serious physical harm," there were facts which might show otherwise, including expert testimony that the position of the body indicated that the right hand was not grasping the trigger and the position of the left arm could not prove that the decedent was aiming his weapon at the officers).

> As noted in *King*:

> With respect to this . . . question and the qualified-immunity analysis, we have little trouble concluding that if Taylor shot King while he was lying on his couch and not pointing a gun at the officers, Taylor violated King's clearly-established right to be free from deadly force. It has been clearly established in this circuit for sometime that "individuals have a right not to be shot unless they are perceived as posing a threat to officers or others" (citations omitted). Genuine disputes of material fact preclude upholding the district courts entry of summary judgment on Taylor's defense of qualified immunity.

*Id.* at 664. Accordingly, a reasonable officer would know that the decedent's right to be free from the use of excessive force in the absence of a threat by the decedent is a clearly established constitutional right.

More specifically, it is clearly established that a driver who presents no imminent danger to an officer or to the public is entitled to be free from the use of deadly force. *See Arrington–Bey v. Cty. of Bedford Heights*, 858 F.3d 988, 992 (6th Cir. 2017) (explaining that clearly established law may not be defined at "a high level of generality") (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011)). The Court also finds that this right's "contours were sufficiently

definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Ashcroft*, 563 U.S. at 741. As explained in *Lewis v. Charter Township of Flint*,

> It has long been established that "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). However, "[when] the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Brosseau v. Haugen*, 543 U.S. 194, 203 (2004) (alteration in original) (quoting *Garner*, 471 U.S. at 11). [When] a person attempts to flee in a vehicle, "police officers are 'justified in using deadly force against a driver who objectively appears ready to drive into an officer or bystander with his car," but "may not use deadly force once the car moves away, leaving the officer and bystanders in a position of safety.'" *Godawa v. Byrd*, 798 F.3d 457, 464 (6th Cir. 2015). Thus, "[when] the car no longer 'presents an imminent danger,' an officer is not entitled to use deadly force to stop a fleeing suspect." *Id.*

*Lewis*, 660 F. App'x at 343, (some citations omitted).

Because in the present case, the question of qualified immunity is dependent upon which view of the facts is accepted by the jury, the Court denies Defendant Spraggins' claim to qualified immunity, and the motion for summary judgment as to Spraggins in his individual capacity is denied.

Claim Against Crockett County

Plaintiffs contend that Crockett County Sheriff Troy Kyle ratified the actions of Spraggins and, thus, rendered Crockett County liable for Spraggins' action under *Monell v. Dep't of Soc. Serv.*, 436 US 658 (1978). Plaintiffs' contention is not well-taken.

Plaintiffs who seek to impose liability on local governments under § 1983 must prove that action taken pursuant to an official municipal policy caused their injury. *Monell*, 436 US at 691, 694. "[T]he official policy must be 'the moving force of the constitutional violation' in order to establish the liability of a government body," *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981) (quoting *Monell*, 436 U.S. at 694), and that body may be held liable only for

constitutional violations resulting from its official policy. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 n. 6 (1986) (citations omitted).

Accordingly, to establish liability under a ratification theory, a plaintiff must show that the ratification was the moving force behind the alleged constitutional violation. *Peabody v. Perry Twp., Ohio*, 2013 WL 1327026 at *12 (S.D. Ohio Mar. 29, 2013) (citing *Williams v. Ellington*, 936 F.2d 881 (6th Cir. 1991)). A municipality cannot be held liable for the ratification of alleged unconstitutional conduct based on a "single, isolated decision" because such a "decision can hardly constitute the 'moving force' behind the alleged constitutional deprivation." *Id.* at 884–85. Thus, "mere acquiescence in a single discretionary decision by a subordinate is not sufficient to show ratification." *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993). Otherwise, the municipality "would be liable for all of the discretionary decisions of its employees, and this would be indistinguishable from *respondeat superior* liability."[21] *Id.* (citations omitted).

Instead, for ratification by a policymaker's final approval to be the moving force behind a constitutional violation, the plaintiff must show that there was a history or pattern of unconstitutional decision-making by the policymakers. *Williams*, 936 F.2d at 884 - 85 (noting that "[t]here was no history that the policy had been repeatedly or even sporadically misapplied by school officials in the past"); *see also Baker v. Union Twp., Ohio,* 2013 WL 4502736 at *22 (S.D. Ohio Aug. 22, 2013), *aff'd in part, appeal dismissed in part sub nom. Baker v. Union Twp.,* 587 F. App'x 229 (6th Cir. 2014) ("Absent evidence of circumstances from which the Court could reasonably infer prior misapplications of the policy, the Court cannot conclude that the ratification of Officer Ventre's conduct was the 'moving force' behind the alleged constitutional

---

[21] It is well settled that a municipality cannot be held liable under § 1983 for an injury caused by its agents or employees based on a theory of *respondeat superior*. *Monell*, 436 U.S. at 691.

violation."); *France v. Lucas*, 2012 WL 5207555 at *13 (N.D. Ohio Oct. 22, 2012), *aff'd*, 836 F.3d 612 (6th Cir. 2016) ("Without evidence of ratification of similar conduct prior to [the defendant officer's] alleged violation, Plaintiffs' *Monell* claim based on alleged ratification falls short.").

There has been no such showing in the present case. Plaintiffs have not pointed to any evidence from which a jury could find a history of Crockett County deputies' misapplying CCSD policy on excessive deadly force. Accordingly, they have not shown that any "ratification" by Sheriff Klyce acted as a moving force for the alleged civil rights violation in this case.

Another way that a plaintiff can establish ratification by a municipality is "by showing ... [that] a final municipal policymaker approved an investigation ... that was so inadequate as to constitute a ratification of their alleged use of excessive force." *Wright v. City of Canton*, 138 F. Supp. 2d 955, 966 (N.D. Ohio 2001); *see also Otero v. Wood*, 316 F. Supp. 2d 612, 627–28 (S.D. Ohio 2004) (noting that a plaintiff can show ratification by pointing to "evidence that a municipality inadequately investigated an alleged constitutional violation [which] can be seen as evidence of a policy that would condone the conduct at issue").[22] Here, there is no evidence that the internal investigation into the shooting was inadequate or flawed.

Because Plaintiffs have not presented evidence that would create an issue of disputed material fact of a pattern of misconduct that was the moving force behind the alleged constitutional violation or of "an investigation ... that was so inadequate as to constitute a

_____

[22] The *Otero* and *Wright* Courts relied, in part, on *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246–48 (6th Cir. 1989), and *Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir. 1985). In *Marchese*, the Court found that the sheriff's failure to investigate his deputies' beating of an inmate constituted ratification of the deputies' actions. *Marchese*, 758 F.2d at 188. Likewise, in *Leach*, a sheriff did not investigate his employees' failure to provide for the medical needs of a paraplegic inmate, which resulted in a finding that the sheriff ratified that failure. *Leach*, 891 F.2d at 1248.

ratification of their alleged use of excessive force," *Wright*, 138 F. Supp. 2d at 966, Defendant Crockett County is entitled to summary judgment on the ratification theory, which is the only remaining claim against it. *See Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478-79 (6th Cir. 1989) (citing *Celotex*, 477 U.S. at 322-23) (holding that a summary judgment movant can challenge the non-movant to "put up or shut up" on a critical issue; the non-movant must then make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" in order to defeat the summary judgment motion.)

Summary and Conclusion

Defendants' motion for summary judgment is **PARTIALLY GRANTED** and **PARTIALLY DENIED**. The motion is **GRANTED** as to all claims against Crockett County and Sheriff Troy Klyce, and they are dismissed from the action. The motion is also **GRANTED** as to the claims against Officer Jordan Spraggins in his official capacity. The motion is **DENIED** as to the excessive force claim against Officer Spraggins in his individual capacity.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
CHIEF UNITED STATES DISTRICT JUDGE


Date: September 5, 2018.